UNITED STATES, Appellee,

v.

Sergeant Robert C. PETE, 433–19–4593, United States Army, Appellant.

ACMR 9100871.

U.S. Army Court of Military Review.

11 Jan. 1994.

For Appellant: Captain Paul H. Turney, JAGC (argued), Colonel Malcolm H. Squires, Jr., JAGC, Lieutenant Colonel James H. Weise, JAGC, Captain Robin N. Swope, JAGC (on brief).

· For Appellee: Lieutenant Colonel Joseph A. Russelburg, JAGC (argued), Colonel Day-
ton M. Cramer, JAGC, Major Kenneth T. Grant, JAGC, Captain Steven M. Walters, JAGC, Captain Maria S.L. Chapa, Captain Louis E. Peraertz, JAGC (on brief).

Before GRAVELLE, JOHNSTON and BAKER, Appellate Military Judges.

## OPINION OF THE COURT ON RECONSIDERATION

JOHNSTON, Judge:

The appellant was tried at Fort Polk, Louisiana, in April 1991, by a general court-martial composed of officer members. Contrary to his pleas, he was found guilty of conspiring to organize a strike, unlawfully organizing and attempting to organize a strike, and soliciting others to participate in a strike in violation of Articles 81 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881 and 934 (1988) [hereinafter UCMJ]. He was sentenced to a dishonorable discharge, confinement for six years, and total forfeiture of all pay and allowances. The convening authority approved the sentence.[1]

This case has been referred to the court for review under the provisions of Article 66, UCMJ, 10 U.S.C. § 866. Utilizing the standard of review in Article 66(c), UCMJ, we may affirm only such findings of guilty and the sentence as we find correct in law and fact and determine, on the basis of the entire record, should be approved.[2]

The essence of the issue on appeal is whether the evidence presented at trial was sufficient to convict the appellant of a violation of the statute prohibiting military labor union activities.[3] See 10 U.S.C. § 976 (1988) [hereinafter Section 976]. The gravamen of Section 976 is the union organizational or

1. On 31 March 1993, the Deputy Assistant Secretary of the Army remitted the unexecuted portion of the appellant's sentence to confinement to that of time served up to that date. Remission cancels the unexecuted portion of the sentence to which it applies. Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 1108(a) [hereinafter R.C.M.].

2. After a panel of the court issued its original opinion in this case, government counsel filed a Motion for Reconsideration and Suggestion for En Banc reconsideration contending that the opinion was unduly restrictive in its interpretation of 10 U.S.C. § 976. The Motion for Reconsideration was granted while the Suggestion for En Banc was denied.

3. Assigned Error II contends:
 THE EVIDENCE IN THIS CASE IS INSUFFICIENT TO CONVICT UNDER 10 U.S.C. § 976(c) BECAUSE THAT STATUTE, BY ITS TERMS, DOES NOT APPLY TO APPELLANT'S ACTIONS.

labor representational aspect of the prohibited concerted activity. In this case the government failed to prove beyond a reasonable doubt that the appellant organized, attempted to organize, or participated in concerted action proscribed by that statute. In addition, the government failed to prove that the appellant was part of a criminal conspiracy. Accordingly, we will set aside the conviction.[4]

## I.

The appellant was a member of the 3d Battalion, 156th Infantry Regiment (Mechanized), Louisiana Army National Guard (3/156 Infantry), from Lake Charles, Louisiana, which was activated in November 1990 for the purpose of participating in Operations Desert Shield and Desert Storm. The unit reported to Fort Polk, Louisiana, and deployed to Fort Hood, Texas, for training in preparation for possible combat in Southwest Asia.

Testimony at trial indicated that conditions at Fort Hood were less than optimal for the recently activated Louisiana National Guard citizen-soldiers. Bad weather, long hours, a lack of food and water in the field, inadequate training, a lack of time off, pay problems, apparent poor leadership, and alleged racial discrimination contributed to low morale in the 3/156 Infantry.

In order to address these morale problems, soldiers from the unit participated in several meetings. The first gathering involved eight to fifteen soldiers who met in their barracks room on 3 February 1991 to discuss their various complaints. They announced that a meeting would be held on 5 February 1991 for soldiers in the battalion.

The appellant contacted several other soldiers and invited them to the meeting to voice their complaints and state their opinions.

The second session began when the appellant and from 60 to 200 other soldiers gathered after duty hours on 5 February 1991 behind the unit dining facility to discuss their concerns. After discussing several options, including a "sit-down," the soldiers apparently reached a consensus that they would go to Lake Charles, Louisiana, by bus to talk to the media and to remain there for seven days. The appellant was identified at trial as a member of the group that was planning the protest. The appellant was heard to remark to another soldier that "[I]f we leave together, we come back together, and we get judged together."

On 6 February 1991, a person who identified himself as "Robert Pete" contacted a commercial bus company to arrange for several chartered buses to transport 100 passengers from Fort Hood, Texas, to Lake Charles, Louisiana, on 7 February 1991, with a return trip scheduled for 14 February 1991. The caller left a telephone number with the bus company that belonged to Specialist Derrick Guidry, a soldier who was later identified as one of the original organizers of the protest.[5] When the agent called back to confirm the arrangements and asked to speak to Robert Pete, another soldier impersonated the appellant and took the message.

The series of informal meetings was interrupted in the early evening hours of 6 February 1991 when the Deputy Brigade Commander, Colonel Frank Catalano, had sol-

4. Appellate defense counsel assigned five other errors, including issues such as preemption, multiplicity, denial of effective assistance of counsel, sentence appropriateness, and unlawful command influence. Pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), the appellant personally asserted four issues, including error by the convening authority and numerous errors by the military judge. We need not address these other issues because of our disposition of the case.

5. Specialist Derrick Guidry, Headquarters and Headquarters Company, 3d Battalion, 156th Infantry Regiment (Mechanized), was tried by general court-martial for his part in the episode

involving the appellant and other soldiers from Lake Charles, Louisiana. Specialist Guidry had contacted representatives of the press and media to inform them about the problems he perceived at Fort Hood. He was convicted of a violation of Article 89, UCMJ, 10 U.S.C. § 889, disrespect toward a superior commissioned officer, for his conduct when apprehended. Specialist Guidry was fined $500.00, and reduced to the grade of E3. He was found not guilty of the same type of charges preferred against the appellant, i.e., conspiracy to organize a strike, attempting to organize a strike, and soliciting soldiers to participate in a strike in violation of Section 976 as charged under Articles 81 and 134, UCMJ.

diers from the 3/156 Infantry assembled at the unit motor pool. He stood on top of a Bradley Fighting Vehicle, ordered the massed soldiers to crowd around his make-shift platform, and spoke to them about their concerns. He talked about the training situation, the leave and pass policy, and other morale issues that affected the soldiers. He explained to them in terms of personal survivability why they had to train intensively and why they could not afford days off in getting ready for a possible deployment into combat. Colonel Catalano mentioned that some members of a sister battalion, the 1st Battalion, 156th Infantry Regiment (Mechanized) from Shreveport, Louisiana, had been absent without leave (AWOL) the previous evening. Colonel Catalano testified that the intent of his meeting with the soldiers from the 3/156 Infantry, most of whom were from Lake Charles, Louisiana, was to ensure that none of them would go AWOL. He wanted to be sure that they understood they could not leave Fort Hood without permission.

After Colonel Catalano's talk, ten to thirty soldiers from the 3/156 Infantry, including the appellant, held a short meeting between 2100 hours and midnight in the area adjacent to the unit dining facility. Someone announced that they had a bus that was to leave from the local K–Mart parking lot at 0500 hours the next day. Several of those who gathered together at that time were upset at the few number of soldiers who came and that at least one of the original organizers, Specialist Guidry, had failed to attend the meeting. Because of the light turn-out, several soldiers assumed that the effort to go to Lake Charles, Louisiana, was "dead." Some of them decided, however, to meet again at 0400 hours the next morning to see who would show up to travel to Lake Charles in order to get time off and to air their grievances at an impromptu press conference.

At approximately 0400 hours the next morning, several soldiers from the 3/156 Infantry were apprehended by military law en-

forcement officials when they gathered in the unit area as they prepared to leave for the local K–Mart store parking lot to meet their bus transportation for Lake Charles. The appellant was apprehended in his room in the barracks at that time. The soldiers were unaware that the Brigade Commander, Brigadier General Whipple, had persuaded the bus company to cancel the buses scheduled to take the soldiers from Fort Hood, Texas, to Lake Charles, Louisiana. At the time of the cancellation, two buses were in Killeen, Texas, on standby for the trip.[6]

II.

The appellant's conduct in this case resulted in several alternative charges being preferred against him. The charges included conspiracy to strike, conspiracy to desert, solicitation to mutiny, attempted desertion, willful dereliction of duty, and participating in an illegal strike. At a session of the trial court prior to arraignment, the trial counsel admitted that the government was "on unchartered [sic] waters" with the illegal strike charge, and stated that they had "charged this particular case in every way possible" in order to be sure that they "had done it right."[7]

At trial the appellant was arraigned on a charge alleging that he had conspired to organize a strike. He was also charged with two specifications alleging violations of Section 976, a noncapital crime or offense prohibited by the United States Code and made applicable to the appellant in court-martial proceedings under clause 3 of Article 134, UCMJ, by organizing and attempting to organize a strike and by soliciting soldiers to participate in a strike.

Under military law, conspiracy is a separate and distinct offense prohibited by Article 81, UCMJ, 10 U.S.C. § 881. The existence of a conspiracy need not take any particular form or be manifested in any formal words. It is generally established by

---

6. As a result of these episodes, the 156th Infantry Regiment (Mechanized) became an object of derision and the butt of jokes circulating around Fort Hood. The unit became known as the "Greyhound Brigade."

7. Ultimately the government elected to withdraw many of these charges.

circumstantial evidence, and is usually manifested by the conduct of the parties themselves. In addition, the conspiracy or agreement need not precede a substantive or overt act, but rather, may be "contemporaneous" with the offense. *See United States v. Matias*, 25 M.J. 356 (C.M.A.1987), *cert. denied*, 485 U.S. 968, 108 S.Ct. 1242, 99 L.Ed.2d 441 (1988).

■ After reviewing the facts of this case, we are satisfied that a concerted action existed. The government failed to prove beyond a reasonable doubt, however, that the appellant's involvement progressed to participation in a conspiracy.

The validity of the remaining charges of which the appellant was convicted depends upon the applicability of the prohibitions contained in Section 976. That section is entitled "Membership in military unions, organizing of military unions, and recognition of military unions prohibited." The specific provisions of the statute that formed the basis for the charges against the appellant specify in pertinent part that:

(c) It shall be unlawful for any person—

. . . .

(3) to organize or attempt to organize, or participate in, any strike, picketing, march demonstration, or other similar form of concerted action involving members of the armed forces that is directed against the Government of the United States and that is intended to induce any civilian officer or employee, or any member of the armed forces, to—

. . . .

(C) make any change with respect to the terms or conditions of service in the armed forces of individual members of the armed forces; . . .

Section 976(c)(3)(C).

The appellant contends that Section 976 was not intended to apply to the type of conduct that he was involved with in this case. He also asserts that the meetings held by the soldiers from the 3/156 Infantry were merely "gripe sessions," and that the right of soldiers to gripe and complain is a historical fact that, heretofore, has not led to prosecution.

The appellant's contentions are buttressed by the provisions of the statute. The statute recognizes the right of soldiers "to present complaints or grievances concerning the terms or conditions of the service. . . ." Section 976(g)(2). The statute also acknowledges the right of any member of the armed forces "to take such other administrative action to seek such administrative or judicial relief, as is authorized by applicable laws and regulations." Section 976(g)(6).

The legislative history of Section 976 also lends credence to the appellant's views.[8] Section 976 was enacted to promote military readiness by prohibiting the membership or enrollment of military personnel in military labor organizations and proscribing the recognition of such unions within the military context. House Report 894 at 7577. The legislative history of the section indicates that Congress determined that labor organizations and the collective bargaining process are incompatible with the discipline and authority which are required in the Armed Forces of the United States. House Report 894 at 7580. The Section-by-Section Analysis in the House Report indicates, in pertinent part, that subsection (c) of Section 976 was intended to prohibit concerted labor union activities which "are intended to induce a member of the Armed Forces or a civilian officer or employee" to make any change in the terms or conditions of service of individual members of the Armed Forces. Section 976(c)(3)(C).

■ In examining the terms of Section 976, the issue before the court is whether the appellant's activities were the type of "concerted action involving members of the armed forces" that the statute proscribes. In order to resolve the issue, several specific questions must be addressed. First, does

---

8. It was evident during consideration of the legislation that the Department of Defense believed that the provisions could be subjected to a "strong constitutional challenge because it might violate the right to free speech and free associa-

tion." House Comm. on Armed Services, H.R. No. 894, 95th Congress, 2d Session (1978), *reprinted in* 1978 U.S.C.C.A.N. 7575, 7587 [hereinafter House Report 894].

the appellant come within the class of persons regulated by the statutory phrase "[i]t shall be unlawful for *any person*" to engage in certain prohibited activities. (Emphasis added). Second, was the ad hoc group of soldiers who attempted to charter a bus and to leave Fort Hood without permission a "military labor organization" as that term is defined by the statute.

The House Report on the legislation indicates that the term "any person" in Section 976(c) "would encompass organizers, officers, agents and representative of the organization who conduct its activities as well as the organization itself." House Report 894 at 7576. The Section-by-Section Analysis in the House Report provides that the term "any person" includes "a labor organization or association as well as its representatives ... who is engaged in organizing or collective bargaining activity." *Id.* at 7581.

Based upon the specific provisions of the statute, and interpreting the statute as a whole in light of the legislative history, we are satisfied that the phrase "any person" is applicable only in the labor organizational, representational, or collective bargaining context. Thus, if the appellant was acting in a labor context, the prohibitions in the statute are applicable to his conduct at Fort Hood.[9]

 A "military labor organization" is defined by Section 976(a)(2) as "any organization" that engages in or attempts to engage in: (A) negotiating or bargaining concerning terms or conditions of military service; (B) representing soldiers in connection with any grievance or complaint arising out of the terms or conditions of military service; or, (C) striking or other similar forms of concerted action directed against the Government of the United States and which is intended to have the effect of bargaining, recognition, or changing conditions of service. Section 976(a)(2)(A), (B), and (C).

We note that the prohibition of Section 976(a)(2)(C) applies to forms of concerted action that are

*intended to induce* any civilian officer or employee, or any member of the armed forces, to—(A) *negotiate or bargain* concerning the terms of conditions of service ... (B) *recognize* any military labor organization as *a representative* of individual members of the armed forces in connection with any complaint or grievances ... or (C) make any *change* with respect to the *terms or conditions of service* in the armed forces of individual members of the armed forces.

Section 976(c)(3). (Emphasis added).

The intended results (i.e., negotiating or bargaining, recognizing a representative, or changing terms or conditions of service) are critical to the application of the statute. In our view, if these union-related objectives are not present in the concerted action attempted, then Section 976(c) is not violated.

We are satisfied that the group of soldiers in this case had no intent to gain union recognition even if some of them intended to influence their commander to change the training conditions they were forced to operate under at Fort Hood. We also find, however, that the government failed to prove beyond a reasonable doubt that the appellant solicited other soldiers to violate the law or that he participated with other members of the group in their efforts to organize, attempt to organize or participate in prohibited concerted action within the meaning of the Section 976(c).

Concerted action by soldiers that disrupts the military, but does not have union-related objectives, may be prohibited by Article 94, UCMJ, 10 U.S.C. § 894. That statute provides, in pertinent part, that a soldier who, "with intent to usurp or override lawful military authority, refuses, in concert with any other person, to obey orders or otherwise do his duty ... is guilty of mutiny." UCMJ, art. 94(a)(1). Unlike Section 976(c), the proscription against mutiny in Article 94 contains no union-related objective in its proscription against concerted activity that seeks to override [i.e. dominate or prevail over] or usurp military authority.

---

9. Section 976 explicitly states that nothing in the statute shall limit the right of any member of the armed forces to join any organization or association not constituting a "military labor organization" as defined in the statute. 10 U.S.C. § 976(g)(1).

If Section 976(c) is interpreted in such a way that union-related objectives are not necessary for a violation of the statute, then two completely different statutes potentially proscribe the same conduct. We do not believe Congress intended this result. *See Whalen v. United States,* 445 U.S. 684, 691 n. 6, 100 S.Ct. 1432, 1437 n. 6, 63 L.Ed.2d 715 (1980) (Congress ordinarily does not intend to punish the same offense under two different statutes). We construe Section 976(c) as proscribing disruptive concerted activity in the military that is indubitably bound with union organizational, representational, or bargaining objectives. The mutiny prohibition, on the other hand, in pertinent part, proscribes concerted acts specifically intended to override military authority. Utilizing this approach, we are satisfied that evidence brought forward by the government at trial failed to show beyond a reasonable doubt that the appellant's conduct violated Section 976(c) as incorporated into military law.

The findings of guilty and the sentence are set aside and the charges are dismissed.

Senior Judge GRAVELLE and Judge BAKER concur.